**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| W AGRIPACKING, S.A. DE C.V., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. CIV 12-738-TUC-CKJ |
| ) | |
| FRESH TOUCH DISTRIBUTING, INC.,) | |
| and MELONS WEST OF NEW YORK,) | **ORDER** |
| INC., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |
| MELONS WEST OF NEW YORK, INC.,) | |
| ) | |
| Counterclaimant/Crossclaimant, ) | |
| ) | |
| vs. ) | |
| ) | |
| W AGRIPACKING, S.A. DE C.V., and) | |
| FRESH TOUCH DISTRIBUTING, INC. ) | |
| ) | |
| Counterdefendant/Crossdefendant. ) | |
| _____ ) | |

Pending before the Court is the Motion for Summary Judgment (Doc. 115) filed by Melons West of New York, Inc. ("Melons West").  W. Agripacking, S.A. de C.V. ("Agripacking") has filed a response and Melons West has filed a reply.  The Court finds it would not be assisted by oral argument and declines to set this matter for hearing.

I. *Factual and Procedural Background*

Melons West had been buying and selling Fairytale pumpkins (pumpkin) and was the biggest buyer of other hard shell squash from produce distributor Fresh Touch Distributing,

Inc. ("Fresh Touch"); they had been doing business together since 2006. (Plaintiff's Statement of Facts ("WA SOF") ¶¶ 2-3)   The principal of Fresh Touch, Patricia Lugo ("Lugo") met the principal of Agripacking, Jose Woolfolk, Jr. ("Woolfolk"), in October 2011. In late 2011, Jason Gisser ("Gisser"), a Melons West salesperson, suggested that Lugo look into having pumpkin grown in Mexico for purchase by Melons West. (WA SOF ¶ 4) In November 2011, Lugo talked to Woolfolk about growing pumpkin. Lugo told Woolfok that she "had a great buyer, which was Melons West of New York, and [asked Agripacking] if they were interested in growing that pumpkin, and they said yes." (WA SOF ¶ 6)  Lugo and Woolfolk had many conversations, both face to face and by telephone.  Lugo told Woolfolk that she had already talked to Melons West and that Lugo was ready for Agripacking to grow the pumpkin.  Lugo initially proposed that Agripacking grow 100 truckloads, of which there would be "fifty truckloads that we were going to contract with Melons West of New York." (WA SOF ¶ 8)

Woolfolk recalls that Lugo first approached him in September or October 2011 about an agreement with Melons West to grow pumpkin. (WA SOF, Ex. B, 26:6-24) Agripacking asserts that Lugo's initial proposal was for 100 truckloads, at $0.22 per pound, not $0.19. (WA SOF, Ex. B, 28:16-29:1)  Further, Agripacking states that, after a series of meetings between Lugo and Woolfolk, an oral agreement was reached in November or December of 2011 to sell the pumpkin squash to Melons West; a written contract would be prepared later. Woolfolk repeatedly requested and insisted that Lugo provide Agripacking with a written contract between Melons West, Agripacking, and Fresh Touch. (WA SOF ¶ 10)  Woolfolk insisted to Lugo that Melons West be a party to the contract with Agripacking because Agripacking was concerned about Fresh Touch's financial strength and ability to handle a large number of truckloads. (WA SOF ¶ 11)  Woolfolk asserts Agripacking would not have signed a two-party contract only with Fresh Touch. (WA SOF ¶ 12)  Agripacking had historically required three-party contracts in other large transactions, e.g., with Fresh Farms (broker) and WalMart (Buyer).  In the same November to December 2011 timeframe, Lugo told Gisser that Agripacking could grow the pumpkin.

1    Melons West asserts that Agripacking and Fresh Touch had entered into an oral
2   agreement for Agripacking to grow and supply pumpkin to Fresh Touch in exchange for
3   Fresh Touch advancing certain costs, including seed, and a portion of Fresh Touch's sale
4   proceeds by November 2011.  Melons West asserts this agreement was solely between
5   Agripacking and Fresh Touch (Melons West Statement of Facts ("MW SOF") ¶ 3), and
6   under it, Fresh Touch was to pay Agripacking directly for the pumpkin Fresh Touch
7   received. (MW SOF ¶ 5)  In April of 2012, after substantial performance had begun on the
8   oral agreement with the pumpkin already planted and near harvest, Melons West entered into
9   a written contract to purchase pumpkin from Fresh Touch.  Melons West points out that
10   Woolfolk testified that he understood the agreement required Melons West to purchase the
11   pumpkin from Fresh Touch. (MW SOF ¶ 24) Woolfolk further testified that he understood
12   Agripacking was selling the pumpkin to Fresh Touch, Fresh Touch would pay Agripacking,
13   and then Fresh Touch would sell the pumpkin to Melons West. (MW SOF ¶ 25) Woolfolk
14   also testified that he did not expect Melons West to be directly obligated to pay Agripacking
15   for the pumpkin. (MW SOF ¶ 26)

16    Agripacking asserts that Lugo testified that Woolfolk called her in March 2012 to get
17   a contract with Melons West and Fresh Touch. (WA SOF ¶18) Lugo drafted the agreement.
18   Lugo testified that she was the first of the three parties to sign the contract, Woolfolk signed
19   it second, and Gisser signed it about a week later.[1]  Agripacking asserts Gisser had no
20   questions regarding Agripacking being a party to the contract. When asked why it took from
21   November 2011 to April 12, 2012 for Gisser to sign, Lugo testified that there "was something
22   mutual between [Agripacking], myself, and myself and [Melons West], where there's that
23   – there was a relationship, and it was a good relationship. So it was really nothing to worry

24   _____

25    [1]Melons West asserts that Gisser understood that he had the authority to sign a
26   contract with a distributor, such as Fresh Touch, but the authority to sign multi-load contracts
    with a grower like Agripacking was reserved to Melons West's principal, Michael Cutler.
27   (MW SOF ¶12) Melons West asserts this is consistent with Cutler's delegation of authority.
    (MW SOF ¶ 12) Agripacking asserts Gisser's understanding of his authority is not relevant
28   and that the statement is not relevant as the agreement at issue is not a multi-load contract.

1   about. I had been dealing with [Melons West] for the past five, six years, never had any

2   problems at all. Really didn't find it a need to rush that contract or hound either one of them."

3   (WA SOF ¶ 23)

4           Agripacking asserts it was Fresh Touch and Melons West's practice to reach terms

5   and then several months later enter into a written, and sometimes oral, contract.  Lugo

6   offered Agripacking a written contract, and told Woolfolk that there would be a contract with

7   a commitment from Melons West to purchase fifty truckloads.  When asked why she

8   included a signature line for Agripacking, Lugo testified because Woolfolk "wanted to be in

9   it." (WA SOF ¶ 26)  Lugo testified that Woolfolk wanted to be "in" the contract to reassure

10  him that Melons West would pick up the allocated truckloads, and pay for them. (WA SOF

11  ¶ 27)  Agripacking delayed harvesting and shipping the pumpkins until it received a signed

12  copy of the agreement.  (WA SOF ¶ 29)  Though Melons West signed in mid-April,

13  Agripacking did not receive a signed copy until early May.

14          The written agreement at issue in this case includes a Fresh Touch letterhead and

15  provides:

16          April 4, 2012

17          Melons West of New York, Inc.
            110 Terrace Dr.
18          Olyphant, PA  18447

19          This acknowledges the mutual agreement between Fresh Touch Distributing, Inc.
            Melons West of New York, Inc. regarding contracted pricing for FAIRY TALE
20          PUMPKIN 24" BINS,

21          The above-named item will be sold to Melons West of New York, Inc. at a price of
            $0.19 P/LB F.O.B. for the time period of April 24, 2012 thru June of 2012.  The
22          approximate quantity to be purchased is 50 TRUCKLOADS.

23          This agreement is approved and recognized by the signatures below.

24          //s Jason Gisser                              //s P. Lugo
            Melons West of New York, Inc.                 Fresh Touch Distributing, Inc.
25          Jason Gisser   (Buyer)                        Patricia Lugo   (Distributor)

26          //s Jose Antonio Woolfolk-Bravo
            W Agripacking
27          Jose Antonion Woolfolk-Bravo (Grower)

28          NON-PERFORMANCE  Neither Fresh Touch Distributing, Inc. or Melons West of

<u>New York, Inc.</u>, shall be held liable for non-performance of this agreement due to natural disaster, fire, war, strike, terrorism, government legislation or regulation or for any other cause beyond the reasonable control Fresh Touch Distributing, Inc. or <u>Melons West of New York</u>.

(MW SOF Ex. 1)   Additionally, the initials "P.L." are handwritten above the term "$0.19 P/LB." (MW SOF ¶ 8)

Agripacking's argument (as opposed to its Statement of Facts) indicates that Melons West received 11 truckloads of pumpkin from Agripacking.  Response (Doc. 121), p. 16. Melons West asserts Fresh Touch sold Melons West pumpkin from a different grower, when Agripacking did not provide Fresh Touch pumpkin. (MW SOF ¶¶ 31-32)  Further, Melons West asserts Agripacking never invoiced Melons West for any pumpkin, and never otherwise requested or received any payments from Melons West.  (MW SOF ¶¶ 36-39)  Agripacking asserts, however, that it sought payment through its counsel on August 28, 2012 (Agripacking Controverting Statement of Fact ("WA CSOF") ¶ 36)  Melons West asserts Fresh Touch sold Melons West pumpkin from a different grower, when Agripacking did not provide Fresh Touch pumpkin. (MW SOF ¶¶ 31-32)

On October 10, 2012, Agripacking filed a Complaint with this Court alleging a Breach of Contract, a Breach of Third Party Beneficiary Contract, a Failure to Account and Pay Promptly, a violation of the Uniform Commercial Code, a Failure to Pay According to Account Stated, and a Conversion against Defendants Fresh Touch and Melons West. Agripacking also alleged an additional claim of Breach of Contract only against Fresh Touch.

On December 10, 2012, Fresh Touch filed an Answer, Crossclaim and Counterclaim. On October 9, 2013, Melons West filed an Answer, Crossclaim and Counterclaim.

II.  *Summary Judgment Legal Standard*

Summary judgment may be granted if the movant shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure.  The moving party has the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the

1  pleadings, depositions, answers to interrogatories, and admissions on file, together with the

2  affidavits, if any," which it believes demonstrate the absence of a genuine issue of material

3  fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

4          Once the moving party has met the initial burden, the opposing party must "go beyond

5  the pleadings" and "set forth specific facts showing that there is a genuine [material] issue

6  for trial." *Id.*, 477 U.S. at 248 (internal quotes omitted); *see also Cusson-Cobb v. O'Lessker*,

7  953 F.2d 1079, 1081 (7th Cir. 1992) (cannot rely on the allegations of the pleadings, or upon

8  conclusory allegations in affidavits). The nonmoving party must demonstrate a dispute "over

9  facts that might affect the outcome of the suit under the governing law" to preclude entry of

10  summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Further, the

11  disputed facts must be material. *Celotex Corp.*, 477 U.S. at 322-23. Further, "a party cannot

12  manufacture a genuine issue of material fact merely by making assertions in its legal

13  memoranda." *S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines) v. Walter*

14  *Kiddle & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

15          The dispute over material facts must be genuine. *Anderson*, 477 U.S. at 248, 106

16  S.Ct. at 2510. A dispute about a material fact is genuine if "the evidence is such that a

17  reasonable jury could return a verdict for the nonmoving party." *Id.* A party opposing a

18  properly supported summary judgment motion must set forth specific facts demonstrating a

19  genuine issue for trial. *Id.* Mere allegation and speculation are not sufficient to create a

20  factual dispute for purposes of summary judgment. *Witherow v. Paff*, 52 F.3d 264, 266 (9th

21  Cir. 1995) (per curiam). "If the evidence is merely colorable or is not significantly probative,

22  summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. However, the evidence

23  of the nonmoving party is to be believed and all justifiable inferences are to be drawn in his

24  favor. *Id.* at 255. Further, in seeking to establish the existence of a factual dispute, the non-

25  moving party need not establish a material issue of fact conclusively in his favor; it is

26  sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

27  parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d 626, 631 (9th Cir.

28  1987).

1   III.  *Consideration of Admissible Evidence*

2          Additionally, the Court is only to consider admissible evidence.  *Moran v. Selig*, 447

3   F.3d 748, 759-60 (9th Cir. 2006) (pleading and opposition must be verified to constitute

4   opposing affidavits); *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 484 (9th Cir. 1991)

5   (declarations and other evidence that would not be admissible may be stricken).  Moreover,

6   "at the summary judgment stage, courts do not focus on the admissibility of the evidence's

7   form.  [Courts] instead focus on the admissibility of its contents."  *Marceau v. International*

8   *Broth. of Elec. Workers*, 618 F.Supp.2d 1127, 1141-42 (D.Ariz. 2009).

9          A "genuine" issue of "material" fact cannot be created by a party simply making

10  assertions in its legal memoranda.  *Varig Airlines*, 690 F.2d at 1238.  Declarations and other

11  evidence that would not be admissible may be stricken.  *FDIC v. New Hampshire Ins. Co.*,

12  953 F.2d 478, 484 (9th Cir. 1991).  Indeed, a "conclusory, self-serving affidavit, lacking

13  detailed facts and any supporting evidence, is insufficient to create a genuine issue of

14  material fact."  *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n. 2 (9th Cir. 2007), *citation*

15  *omitted*.  Moreover, statements must allege personal knowledge.  *See Skillsky v. Lucky*

16  *Stores, Inc.*, 893 F.2d 1088, 1091 (9th Cir. 1990) ("Like affidavits, deposition testimony that

17  is not based on personal knowledge and is hearsay is inadmissible and cannot raise a genuine

18  issue of material fact sufficient to withstand summary judgment."); *see also Block v. Los*

19  *Angeles*, 253 F.3d 410, 419 n. 2 (9th Cir. 2001); *Radobenko v. Automated Equip. Corp.*, 520

20  F.2d 540, 544 (9th Cir. 1975), *quoting Perma Research & Development Co. v. Singer Co.*,

21  410 F.2d 572, 578 (2nd Cir. 1969) ("[i]f a party who has been examined at length on

22  deposition could raise an issue of fact simply by submitting an affidavit contradicting his

23  own prior testimony, this would greatly diminish the utility of summary judgment as a

24  procedure for screening out sham issues of fact").  Additionally, the court is to review the

25  record as a whole, but must disregard evidence favorable to the moving party that the jury

26  is not required to believe and must give credence to the uncontradicted and unimpeached

27  evidence of the moving party, at least "'to the extent that that evidence comes from

28  disinterested witnesses.'"  *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150-51, 120 S.Ct.

1   2097, 2110 (2000), *citation omitted*.

2          The controverting statements and objections place the statements in context and

3   clarify them.  Although the Court will not address each dispute, the Court will only consider

4   the admissible evidence that is supported by specific facts that may show a genuine issue of

5   material fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510

6   (1986).

7

8   IV.  *Validity of Contract*

9          For a valid contract to exist, there must have been an offer, acceptance of the offer,

10  consideration, sufficient specification of terms so that the obligations involved can be

11  ascertained, *K–Line Builders, Inc. v. First Fed. Sav. & Loan Ass'n*, 139 Ariz. 209, 212, 677

12  P.2d 1317, 1320 (App.1983), and the parties must have intended to be bound by the

13  agreement, *Schade v. Diethrich*, 158 Ariz. 1, 9, 760 P.2d 1050, 1058 (1988) ("the

14  requirement of certainty is not so much a contractual validator as a factor relevant to

15  determining the ultimate element of contract formation—the question whether the parties

16  manifested assent or intent to be bound").  Additionally, "[i]t is well established that, in an

17  action based on breach of contract, the plaintiff has the burden of proving the existence of

18  a contract, breach of the contract, and resulting damages." *Chartone, Inc. v. Bernini*, 207

19  Ariz. 162, 170, 83 P.3d 1103, 1111 (App. 2004).  Arizona "permits the consideration of

20  extrinsic evidence . . . on the issue of contract interpretation." 1 Ariz. Prac., Law of Evidence

21  § 104:8 (4th ed. 2013) (citations omitted).   Further, parol evidence is appropriate for

22  consideration in resolving a motion for summary judgment.  *See e.g., Taylor v. State Farm*

23  *Mut. Auto. Ins. Co.*, 175 Ariz. 148, 854 P.2d 1134 (1993).

24          The Supreme Court of Arizona has stated:

25           We cited with approval the Second Restatement of Contracts' [§ 24] definition of an
         offer as "the manifestation of willingness to enter into a bargain, so made as to justify
26       another person in understanding that his assent to that bargain is invited and will
         conclude it." [*Tallent v. National General Insurance Co.*, 185 Ariz. 266, 268, 915
27       P.2d 665, 667 (1996).] Thus, whether an offer has been made does not depend on the
         offeree's understanding of the terms of the offer, but instead on whether a reasonable
28       person would understand that an offer has been made and that, upon acceptance, the

1    offeror would be bound.  [Citation omitted.]

2    *Ballesteros v. American Standard Ins. Co.*, 226 Ariz. 345, 348, 248 P.3d 193, 196 (2011).

3    An acceptance is a manifestation of assent to the terms of an offer in the manner invited or

4    required by the offer.  *Contempo Const. Co. v. Mountain States Tel. & Tel. Co.*, 153 Ariz.

5    279, 281, 736 P.2d 13, 15 (App. 1987).  "Consideration is defined as bargained for exchange

6    whereby the promisors . . . receive some benefit or the promisee . . . suffers a detriment."

7    *Coup v. Scottsdale Plaza Resort, LLC*, 823 F.Supp.2d 931, 943 (D.Ariz. 2011).

8        Further, the Supreme Court of Arizona has stated:

9        The fact that one or more terms of a proposed bargain are left open or uncertain may
         show that a manifestation of intention is not intended to be understood as an offer or
10       as an acceptance.

11       Restatement § 33(3).

12       . . . But the actions of the parties may show conclusively that they have intended to
         conclude a binding agreement, even though one or more terms are missing or are left
13       to be agreed upon.  *In such cases courts endeavor, if possible, to attach a sufficiently
         definite meaning to the bargain.*
14
         *Id*. comment a (emphasis added).
15
     *Schade*, 158 Ariz. at 9, 760 F.3d at 1058.  "The requirement of certainty is not so much a
16
     contractual validator as a factor relevant to determining . . . whether the parties manifested
17
     assent or intent to be bound."  *Schade*, 158 Ariz. at 9.  "Any requirement of 'reasonable
18
     certainty' is satisfied if the agreement that was made simply provides 'a basis for determining
19
     the existence of a breach and for giving an appropriate remedy.'"  *Estate of Decamacho ex
20
     rel. guthrie v. La Solana Care and Rehab, Inc.*, 234 Ariz. 18, 21, 316 P.3d 607, 610 (App.
21
     2014) (citations omitted).  Additionally, "[m]utual assent is ascertained from objective
22
     evidence, not from the hidden intent of the parties. Objective evidence includes written and
23
     spoken words as well as acts."  *Johnson v. Earnhardt's Gilbert Dodge, Inc*., 212 Ariz. 381,
24
     384, 132 P.3d 825, 828 (2006).
25
         Melons West asserts neither Agripacking nor Melons West communicated to the other
26
     any offers for a contract for the sale or purchase of pumpkins.  In fact, Melons West asserts
27
     it is undisputed that Agripacking and Melons West never communicated with one another
28

at all, let alone manifested any willingness to enter into a transaction with each other as to the purchase/sell of pumpkin.   Further, Melons West asserts that, because neither Agripacking nor Melons West ever made an offer to the other for the pumpkin, neither party had an offer to accept.  Melons West asserts the written agreement memorializes the offer and acceptance between Melons West and Fresh Touch.  Additionally, Melons West's signatory, Gisser, had no intent to contract with Agripacking and knew he was without the authority to accept an offer for a multi-load contract with a grower.  The absence of any communications or negotiations between the parties precludes any contracting intent or a meeting of the minds.

Additionally, Melons West asserts there is no mutuality of obligation between Agripacking and Melons West.  For example, Gisser testified that it was his assumption that Agripacking signed the written agreement as a witness and not a party.  Melons West points to Lugo's testimony to show that Melons West and Fresh Touch did not intend for Agripacking to be a party to the written agreement, and understood that Agripacking signed as a non-party witness. (MW SOF ¶¶ 14, 19-21)  Indeed, Melons West[2] asserts Agripacking admits that Melons West had no obligation to pay Agripacking for pumpkin. (MW SOF ¶ 26[3]) Agripacking further admits it was required to sell pumpkin to Fresh Touch (MW SOF ¶ 25), that the agreement requires Melons West to purchase pumpkin from Fresh Touch (SOF¶24), and that Melons West and Fresh Touch could perform all terms of the Fresh Touch Contract without Agripacking's involvement:

Agripacking asserts, however, that the existence of the contract is not disputed, only whether Agripacking was a party to the contract.  Therefore, Agripacking does not address whether the elements of a valid contract exist as to Agripacking.  This appears to be based

---

[2]As to the assertions of Melons West regarding statements attributed to Agripacking, Agripacking points out that it was not deposed.

[3]Woolfolk testified that he did not expect Melons West to be obligated to directly pay for the pumpkin.

on a theory that Fresh Touch was acting as a "middle man" between Agripacking and Melons West.  In considering the elements of the agreement in this case, the Court considers that all parties, including Melons West, must have intended to be bound by the agreement with each other.  *See e.g. Tabler v. Industrial Com'n of Arizona*, 202 Ariz. 518, 47 P.3d 1156 (App. 2002).  Furthermore, "[t]he determination of the parties' intent must be based on objective evidence, not the hidden intent of the parties."  *Tabler*, 202 Ariz. at 521, 47 P.3d at 1159.  This may include consideration of the surrounding circumstances and conduct of the parties."  *Id*.

While the determination of intent is a question of fact, *id*., there must be a genuine dispute as to whether Melons West intended to be bound by the agreement for Agripacking to survive summary judgment. Agripacking asserts that the signing of the agreement by Gisser on behalf of Melons West with Agripacking's signature already on the agreement shows Melons West intended to agree be bound to accept (and pay for) pumpkin from Agripacking.  However, Agripacking has not presented any authority that the signature and designation alone establishes a party intends to be bound to that signer.

Agripacking and Melons West dispute the significance of Agripacking being a signatory to the agreement without otherwise having been named in the agreement.  A person is not a party to a contract simply because its name appears somewhere on the written document.  *Ferrell v. Elrod*, 63 Tenn.App. 129, 147, 469 S.W.2d 678, 682-83 (1971).  Indeed, a person who signs a contract, but is neither named in the body of that contract nor undertakes any obligations or receives any benefits by its terms, is not a party to it. *See, In re Dickerson's Estate*, 600 S.W.2d 714, 717 (Tenn. 1980) (signature alone contains no promise to answer for debt) (citing *Ferrell*).  However, courts have also held that a signatory not named in a contract may be a contracting party. *Woodcock v. Udell*, 97 A.2d 878, 881 (Del. Super. Ct. 1953).

Agripacking and Melons West each cite cases in support of their positions.  As referenced by Melons West, "[i]t is a general rule of interpretation of contracts that when the body of a contract purports to set out the names of the parties thereto and a person not named

- 11 -

in the body of the contract signs the contract and nothing in the contract indicates that such

person signed as a party, then such person is not bound as a party to the contract and is not

liable thereunder." *In re Dickerson's Estate*, 600 S.W.2d 714, 716 (Tenn. 1980). Similarly,

a treatise summarizes the issue as follows:

> Generally, when the body of a contract purports to set out the names of the parties thereto and a person not named in the body of the contract signs the contract, and there is nothing in the contract to indicate that such person signed as a party, such person is not bound by the contract and hence is not liable thereunder. In other cases, it has been held that under the circumstances the person who signed but was not named in the body of the contract as a party thereto was nevertheless liable on the contract. Also, in cases involving unilateral contracts or surety or guaranty bonds, the person who signed, although not named in the body of the contract, was held liable on the contract as a party thereto.

> According to some authority, the rule that a person who signs an instrument, but is not named therein is not a party thereto, is applicable only where the instrument itself distinctly designates others as parties. It has been held that where a person signs an instrument with the intention of being a party thereto and the omission of such person's name from the body thereof was unintentional, such person will be considered as a party to the contract. Although a person may not be named in a contract where others are so designated, he or she nevertheless may be held liable as a party to the contract where the text of the instrument concludes with a phrase, in words or to the effect that "we bind ourselves," etc.

17A Am. Jur. 2d Contracts § 414 (May 2015) (citations omitted). Another treatise states:

> The term "party," in the context of a contract, means those with whom the contract is actually made or entered into, and one is a party to an agreement not only by promising to do certain things but also by being the recipient of another's obligation to perform. The determination as to who are the parties to a contract is decided on a case by case basis, and generally, the identity of the parties to a contract is ascertained from an examination of the written instrument. If the identity of the parties is not clear on the face of the writing, the identities must be determined as a question of intent under the general rules of construction. Thus, where the identity of the parties to a contract is not clear, all of the facts and circumstances surrounding the making of the contract may be considered to determine who are the actual parties. Extrinsic evidence is admissible if the identity of the parties to a contract is ambiguous.

> A person is not made a party to a contract merely by being named or described in it, or merely by the fact that the contract is referred to in a writing which evidences another contract to which such person is a party. . . A person has the right to determine who will be the person's debtor or obligor, or the other contracting party, and it is not permissible to thrust another on such person without his or her consent.

17A C.J.S. Contracts § 462 (June 2015) (citations omitted).

        In other words, the determination of whether a signatory is a party to the agreement

is to be determined on a case-by-case basis, looking at the terms of the written agreement or

determining the intent under general rules of construction. It appears the agreement purports

1    to name Fresh Touch and Melons West as the contracting parties.  However, Agripacking

2    argues that the statement that "[t]his agreement is approved and recognized by the signatures

3    below" is intended to have the effect similar to "we bind ourselves[.]" 17A Am. Jur. 2d

4    Contracts § 414 (citations omitted).  Moreover, although a person is not party to a contract

5    simply because its name appears somewhere on the written document, *Ferrell v. Elrod*, 63

6    Tenn.App. 129, 147, 469 S.W.2d 678, 682-83 (1971), here Agripacking is not just named,

7    but designated as "Grower."  Agripacking cites to *Mudd v. Goostree*, 2013 WL 1402157

8    (Tenn.Ct.App. 2013), as an example of a signature with a designation sufficient to bind a

9    party.  However, the contract in *Mudd* was a lease for which the designation at issue was a

10   tenant – by the very nature of the agreement a tenant was a necessary party.

11        Indeed, the designation of Agripacking as "Grower" supports a conclusion that a

12   genuine dispute exists as to whether Agripacking had been designated as a party.  *See e.g.*

13   *St. Regis Apartment Corp. v. Sweitzer*, 32 Wis.2d 426, 145 N.W.2d 711 (1996) (approving

14   use of parol evidence to resolve ambiguity of whether signatory was a party).  Similarly,

15   Agripacking points out that Melons West asserts Fresh Touch included Agripacking's

16   signature line as a courtesy, but that Melons West thought Agripacking was signing as a

17   witness.  In other words, it is disputed why the Agripacking signature was included.

18   Additionally, the circumstances surrounding the agreement support Agripacking's position.

19   For example, the delay in the signing of the agreement could mean the parties were working

20   together and trusted each other.  Further, the designation of the roles each signatory played

21   supports an interpretation that Fresh Touch was the "middle man" and, ultimately,

22   Agripacking was growing the product for Melons West to purchase.  Lastly, it is not clear

23   if the "approval" of the agreement was meant to bind each of the parties to each other.

24   Simply put, the terms (including the designations and the signatories) present a reasonable

25   inference that the parties all intended to be bound to each other.  *See e.g. AROK Constr. Co.*

26   *v. Indian Constr. Servs.*, 174 Ariz. 291, 295, 848 P.2d 870, 874 (App.1993) (citation omitted)

27   ("[The realist approach] emphasizes standards rather than rules, and assigns to courts the task

28   of upholding the agreements parties intended to make.")   The Court finds that there is a

1   genuine dispute as to whether the fact that Agripacking is not named in the body of the
2   agreement means it is not a party to the agreement.

3

4   V. *Agripacking's Claims Requiring Valid Contract Between Agripacking and Melons West*

5           Because there is a genuine dispute as to the intent of Melons West to be bound by an
6   agreement with Agripacking, there is a dispute as to whether there is an enforceable contract
7   between Agripacking and Melons West.   The Court finds summary judgment as to
8   Agripacking's claims for breach of contract and a violation of the Uniform Commercial Code
9   is not appropriate.

10          As to Agripacking's claim that Melons West failed to account and pay promptly, the
11  parties dispute whether Agripacking requested payment from Melons West.  Specifically,
12  Agripacking asserts it contacted Melons West on August 28, 2012, through counsel, to
13  request Melons West pay for the pumpkin pursuant to the April 4, 2012, agreement.  The
14  Court finds there is a genuine dispute as to the existence of an enforceable contract and
15  whether a request for payment was made.  The Court finds summary judgment on this issue
16  is not appropriate.

17          As to Agripacking's account stated claim, the Arizona Court of Appeals has stated
18  that "an account stated 'signifies an agreed balance between the parties to a settlement; that
19  is, that they have agreed after an investigation of their accounts that a certain balance is due
20  from one to the other.'"  *Citibank, N.A. v. Okonkwo*, No. 1 CA–CV 13–0329, 2014 WL
21  1851960 *3 (Ariz.App. May 6, 2014) (quoting *Holt v. W. Farm Servs., Inc.* 110 Ariz. 276,
22  278, 517 P.2d 1272, 1274 (1974)).  Evidence has not been presented to establish that there
23  is a genuine dispute as an agreed balance between Agripacking and Melons West.  The Court
24  will grant summary judgment in favor of Melons West and against Agripacking as to this
25  claim.

26

27  VI. *Agripacking's Claim for Breach of Third-Party Beneficiary Contract*

28          In Arizona, to establish a third-party beneficiary breach of contract claim, ". . . the

contract must indicate an intention to benefit the third party beneficiary, . . .the contemplated benefit must be both intentional and direct, and . . . it must be clear that the parties intended to recognize the third party as the primary party in interest." *Valles v. Pima County*, 642 F.Supp.2d 926, 956 n.6 (D. Ariz. 2009) (citing *Norton v. First Fed. Sav.*, 128 Ariz. 176, 178, 624 P.2d 854, 856 (1981)).  It is not enough that a contract may operate to a person's benefit, but it "must appear that the parties intended to recognize the [person] as the primary party in interest and as privy to the promise." *Sherman v. First Am. Title Ins.*, 201 Ariz. 564, 567, 38 P.3d 1229, 1232 (App. 2002) (citation omitted); *Tanner Cos. v. Ins. Mktg. Servs., Inc.*, 154 Ariz. 442, 444, 743 P.2d 951, 953 (App.1987) (stating a party may not recover as a third party beneficiary "if it is merely an incidental beneficiary . . . rather than one for whose express benefit the [contract] was made"). Whether a person is an incidental or direct beneficiary is a question of construction, which is a question of law for the court. *Nahom v. Blue Cross and Blue Shield of Arizona, Inc.*, 180 Ariz. 548, 553, 885P.2d 1113, 1118 (App. 1994); *Maganas v. Northroup*, 135 Ariz. 573, 575, 663 P.2d 565, 567 (1983).  However, the Court of Appeals of Arizona has found third party beneficiary status where the beneficiary was not specifically named but qualified for a status identified in the contract (sub-contractor).  *U.S. Fidelity and Guar. Co. v. Farrar's Plumbing and Heating Co., Inc.*, 158 Ariz. 354 (Ariz.App. 1988).

In this case, Agripacking was specifically named as the Grower in the agreement. There is a genuine issue of material fact, the significance of this designation, in dispute – it is not clear whether Fresh Touch and Melons West intended to recognize Agripacking as a primary party in interest. *See e.g.* RAJI Contract 15.  The Court finds summary judgment as to this claim is not appropriate.

## VII. *Agripacking's Claim for Conversion*

In Arizona, "[c]onversion is defined as 'an act of wrongful dominion or control over personal property in denial of or inconsistent with the rights of another.'  To maintain an action for conversion, a plaintiff must have had the right to immediate possession of the

1   personal property at the time of the alleged conversion." *Case Corp. v. Gehrke*, 208 Ariz.

2   140, 143, 91 P.3d 362, 365 (App. 2004) (citations omitted). "At early common law there was

3   some question as to whether money could be the subject of a conversion because of its lack

4   of specific identification." *Autoville, Inc. v. Friedman*, 20 Ariz. App. 89, 91, 510 P.2d 400,

5   402 (1973). "However, the modern rule, in which Arizona joins, is that money can be the

6   subject of a conversion provided that it can be described, identified or segregated, and an

7   obligation to treat it in a specific manner is established." *Id.* "Money is not the proper

8   subject of a conversion claim when the claim is used merely 'to collect on a debt that could

9   be satisfied by money generally.'" *Liberty Life Ins. Co. v. Myers*, CV 10–2024–PHX–JAT,

10  2013 WL 530317 * 12 (D.Ariz. Feb. 12, 2013)

11      Agripacking's conversion claim seeks to "collect on a debt that could be satisfied by

12  money generally." *Case Corp.*, 208 Ariz. at 143, 91 P.3d at 365. Under Arizona law, such

13  money cannot be subject of a conversion claim. *Id.*; *see also Koss Corp. v. American Exp.*

14  *Co.*, 233 Ariz. 74, 90, 309 P.3d 898, 914 (App. 2013). Summary judgment in favor of

15  Melons West and against Agripacking on this claim is appropriate.

16

17      Accordingly, IT IS ORDERED:

18  1.   Melons West of New York, Inc.'s Motion for Summary Judgment (Doc. 115)

19       is GRANTED IN PART AND DENIED IN PART.

20  2.   Summary judgment in granted in favor of Melons West and against

21       Agripacking as to Agripacking's claims of a Failure to Pay According to

22       Account Stated (Count 6) and Conversion (Count 7).

23  3.   The parties shall submit a Joint Pre-Trial Statement (Proposed Order) as to the

24       remaining claims within 30 days of the date of this Order.[4]

25

26

27      [4]The remaining claims alleged by Agripacking are: Count 1: Breach of Contract, Count 2: Breach of Third Party Beneficiary Contract, Count 4: Failure to Account and Pay

28  Promptly, and Count 5: Uniform Commercial Code.

4.      The Clerk of Court shall mail a copy of this Order to:

> Jose Woolfolk
> W. Agripacking S.A. de C.V.
> 396 Boulevard Luis Encinas
> Hermasillo, Sonora, Mexico  83200

DATED this 27th day of August, 2015.


_____
Cindy K. Jorgenson
United States District Judge